DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Lucas County Court of Common Pleas, which entered a judgment and sentenced appellant following a jury verdict finding her guilty of murder and aggravated robbery. For the reasons that follow, we affirm the decision of the trial court.
 {¶ 2} In 2002, appellant Christina Robinson was indicted in a two-count complaint for the murder and aggravated robbery of Aaron Jaquillard. Both counts included firearms specifications. Though the evidence was clear that Jaquillard died as a result of gunshot wounds, the jury found appellant guilty of the murder and the aggravated robbery but found her not guilty on the firearm specifications. Appellant contends that the verdict was thus against the manifest weight of the evidence and violative of due process, and she also complains of error in the jury instructions and in sentencing.
 {¶ 3} Aaron Jaquillard was killed in April 2001, when he went to collect drug money at the home of appellant and Christopher Johnson. Jaquillard was shot three times, once in the stomach, once in the back, and once in the head. The shot to the head was instantly fatal, though the others, left untreated, were certainly fatal as well. Appellant and Johnson gave differing testimony about the killing.
 {¶ 4} Johnson testified that Jaquillard called him on April 12, 2001, demanding the $1,000 that Johnson owed him for cocaine. According to Johnson, Jaquillard indicated that he would come by Johnson's home at about 2:30 a.m. on April 13 to collect the money. Johnson testified that Jaquillard threatened Johnson, appellant, appellant's daughter, and Johnson's grandparents if he did not get the money owed to him when he came over. Johnson was able to pull together about $700 but could not get the rest. Both he and appellant took the threats seriously and were both scared. They discussed killing Jaquillard when he came to collect the money. The following exchange took place during Johnson's direct testimony:
 {¶ 5} "Q: Was there a plan to shoot Aaron Jaquillard when he was coming over that night?
 {¶ 6} "A: We had talked about it, yes.
 {¶ 7} "Q: Did you expect or plan on doing it?
 {¶ 8} "A: No. I really didn't think we were going to go through with that. I thought it was talk.
 {¶ 9} "Q: But it was certainly going to be possible. You had a gun, right?
 {¶ 10} "A: Yes. We talked about it because of the way the threats were towards, you know, the grandparents, her [appellant's] child.
 {¶ 11} "Q: Okay.
 {¶ 12} "A: But I thought it was just more that we were — we were both mad, you know, at him, you know, that kind of talk."
 {¶ 13} A similar exchange took place on cross-examination:
 {¶ 14} "Q: Had you thought about maybe getting the people out of your house and going over to [a relative's] before Aaron got there?
 {¶ 15} "A: No.
 {¶ 16} "Q: Had you thought about getting the people out of your house and going anywhere else than waiting there for Aaron Jaquillard?
 {¶ 17} "A: No.
 {¶ 18} "Q: This thought never crossed your mind?
 {¶ 19} "A: Huh-uh.
 {¶ 20} "Q: But the thought to conspire, as you told us, with [appellant] to kill him, that's the thought you had at the time?
 {¶ 21} "A: I didn't think it was going to come to that. I thought it was just talk that we was — because we were both upset about what he had said. I didn't think that was going to transpire like that. I thought we could have worked it out with him, could have gave him the money I had, could have worked it out.
 {¶ 22} "Q: Didn't you just tell us before lunch that you and [appellant] planned to kill him when he came over, because of these threats?
 {¶ 23} "A: Yes.
 {¶ 24} "Q: When did the two of you come up with this plan?
 {¶ 25} "A: After he had threatened me."
 {¶ 26} Later, Johnson testified that he and appellant talked about killing Jaquillard "throughout the day" preceding the murder. However, he again testified that he did not think they would go through with it.
 {¶ 27} According to Johnson, when Jaquillard came to the house at 2:30 a.m. on April 13, he (Johnson) gave Jaquillard what he had of the money and Jaquillard was not happy. At this point, appellant appeared and shot Jaquillard in the back and then in the stomach. Johnson testified that he was "shocked." He testified that appellant then gave the gun to him and told him to shoot Jaquillard because he (Johnson) was "part of this." Appellant also indicated, according to Johnson, that she shot Jaquillard because "that's what [they] had talked about." Because he was scared of what would happen to him if Jaquillard lived, Johnson shot him in the head. Then, according to Johnson, appellant took Jaquillard's wallet and his money and later gave Johnson "a few hundred dollars" from it.
 {¶ 28} Johnson testified that after Jaquillard died, he pulled his body out the back door and onto the porch. Appellant pulled Jaquillard's vehicle up to the back porch, and the two of them got Jaquillard's body into his own vehicle. Johnson then pulled up the blood-soaked carpeting and put it on the back porch. Appellant told Johnson that she would clean up the mess in the house and he should drive Jaquillard's body somewhere, suggesting that he put the car into water. Not finding that feasible, Johnson drove Jaquillard's car to a remote area in Erie, Michigan, and left him there with the car running. He returned home on foot. When he arrived home, his gun was wrapped in flannel and was under his bed. Appellant was cleaning blood off the floor and walls. They dragged the bloody carpeting out behind the garage and set it underneath some brush and some old pallets. They put some of the carpet padding and the victim's shoes out to the curb for the garbage pick-up that day. Some of Jaquillard's family members began calling and coming to the house inquiring about his whereabouts, and Johnson and appellant denied having seen him that day. The two of them then went to a relative's house and were arrested within a day or so.
 {¶ 29} Appellant's testimony sharply diverged from Johnson's testimony. She testified that on April 12, the day before the murder, Johnson told her that Jaquillard had called and was angry about money that he (Johnson) owed him. He told appellant that he only owed Jaquillard $100. There was no discussion of killing or injuring Jaquillard. When Jaquillard came to the house at about 2:30 a.m. the next morning, appellant was in her room getting ready for bed. She heard a gunshot and ran out into the living room. She testified that she saw a man on the floor and Johnson standing over him pointing a gun at his stomach. She testified that she observed Johnson shoot Jaquillard in the stomach, but she only heard the other two shots. According to appellant, she was shocked, and she went toward the phone, stopping when Johnson pointed the gun at her and yelled. She ran back in the bedroom. When the shooting was over, she told Johnson that they needed to call an ambulance, and Johnson told her, "He's dead. There's no point in it." He then put the gun to her head and told her to clean up the mess. She refused, and he put the gun to her head again and said, "You see how easy it was for me to do this. I will do it to you and your family." Appellant testified that she then cleaned up, but she never touched the body and did not help Johnson get Jaquillard's dead body into the car. Appellant admitted helping to take the bloody carpeting out back. She denied ever even seeing Jaquillard's wallet.
 {¶ 30} At the conclusion of the testimony, the trial court instructed the jury. Included in the instructions was this instruction on aiding and abetting:
 {¶ 31} "Ladies and gentlemen of the jury, you are instructed that a person who knowingly aids, helps, assists, directs, or associates himself with another for the purpose of committing an offense is regarded as if he were the principal offender and is as guilty as if he personally performed every act constituting the offense.
 {¶ 32} "When two or more persons have a common purpose to commit a crime and one does one part and the second performs another, those acting together are equally guilty of the crime.
 {¶ 33} "The court further instructs you that the mere presence of a person at the scene of a crime, should you find beyond a reasonable doubt that a crime was committed, without his having any participation in the crime, or without any purpose to aid, to help or assist another in the commission, it does not constitute aiding and abetting or complicity.
 {¶ 34} "One does not aid or abet if he sees a crime being committed. He must have some part in the crime himself, such as aiding, helping, assisting or encouraging or directing another."
 {¶ 35} Following deliberation, the jury found appellant guilty of murder but not the firearm specification and guilty of aggravated robbery but not the firearm specification. Appellant now appeals, setting forth the following assignments of error:
 {¶ 36} "Assignment of Error No. 1 Ms. Robinson's convictions are against the manifest weight of the evidence.
 {¶ 37} "Assignment of Error No. 2 The trial court committed error when it refused to instruct the jury that being an accessory after the fact is not a basis on which it can convict of the underlying offense.
 {¶ 38} "Assignment of Error No. 3 The inconsistent verdicts on the principle offenses and the firearm specifications violate Ms. Robinson's rights to due process and require that the convictions be set aside and she be granted a new trial.
 {¶ 39} "Assignment of Error No. 4 The consecutive sentence of eight years in prison for the aggravated robbery is contrary to law because the record does not support the findings made by the trial court."
 {¶ 40} Since appellant challenges the alleged inconsistent verdicts on both manifest weight and due process grounds, and since a manifest weight challenge is essentially a due process concern, see, e.g., State v.Cureton (Jan. 8, 1997), 6th Dist. No. L-93-047, we shall discuss the first and third assignments of error together.
 {¶ 41} Appellant contends in her first assignment of error that the verdicts are against the manifest weight of the evidence. "Weight of the evidence" refers to the jury's resolution of conflicting testimony. Statev. Thompkins (1997), 78 Ohio St.3d 380, 387. In determining whether a verdict is against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 387.
 {¶ 42} In resolving the first and thirds assignments of error, two questions are extant: (1) whether the verdicts are inconsistent; and (2) whether inconsistent verdicts violate due process. First, we shall address whether the verdicts are inconsistent. In this case, the jury apparently believed that appellant was guilty of murdering Jaquillard but that she did not shoot him. These two conclusions are consistent if the jury believed that appellant was complicit in the crime but was not the actual shooter. The Ohio Supreme Court has held that one is guilty as an aider and abettor if one "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime."State v. Johnson (2001), 93 Ohio St.3d 240, syllabus. The court also held in Johnson that criminal intent can be inferred from "presence, companionship and conduct before and after the offense is committed." Id. at 245, quoting State v. Pruett (1971), 28 Ohio App.2d 29, 34. The Supreme Court in Johnson held that the defendant was guilty as an aider and abettor because he participated in a plan to hunt down and kill a rival gang member and then rode in a car with the eventual shooter while looking for the intended victim.
 {¶ 43} In this case, the trial court instructed the jury that a defendant is guilty of aiding and abetting if she "aids, helps, assists, directs, or associates himself with another for the purpose of committing an offense." The jury had before it evidence that, if believed, established that appellant helped plan the murder and then assisted in covering it up. According to Ohio law as set out in Johnson, this evidence shows that appellant, with criminal intent, "supported" or "cooperated with" Christopher Johnson in planning and carrying out the murder and the robbery. Therefore, it would not be inconsistent for the jury to find that appellant was guilty of murder and aggravated robbery as an aider and abettor but not as the principal offender.
 {¶ 44} Nevertheless, appellant contends that her only involvement in the crime was cleaning up afterwards, which appellant contends makes her no more than an accessory after the fact. According to appellant, the simple act of cleaning up after the murder cannot make her guilty of the murder itself. However, appellant ignores the fact that the jury had before it evidence that appellant helped plan the murder. Appellant also disregards the law holding that criminal intent can be inferred from conduct both before and after the crime. See Johnson, 93 Ohio St.3d at 245. If the jury believed that appellant helped plan the murder and cleaned up afterwards, the jury did not "lose its way" in finding appellant guilty as an aider and abettor.
 {¶ 45} Even assuming that the verdicts are inconsistent, we have recently held that such verdicts do not violate due process. State v.Davis, 2002-Ohio-3046, 6th Dist. No. L-00-1143, appeal denied (2002),97 Ohio St.3d 1421. In Davis, as in this case, the victim died of gunshot wounds. The jury found the defendant guilty of aggravated murder but was unable to reach a verdict on the firearm specification. The defendant argued that the verdicts were inconsistent and violated his right to due process and his right to be free from cruel and unusual punishment. We disagreed, holding that "when a principle charge in an indictment is not dependent on an attached specification, a conviction on the principle charge, coupled with an acquittal on the specifications, does not invalidate the principle conviction." Id. at ¶ 24, citing State v.Perryman (1976), 49 Ohio St.2d 14, vacated, in part, on other grounds,Perryman v. Ohio (1978), 438 U.S. 911. See, also, State v. Beach,2004-Ohio-5232, 6th Dist. No. L-02-087, at ¶ 55 (following Davis). Appellant acknowledges the Davis case but argues that it is "simply wrong" in light of Penry v. Johnson (2001), 532 U.S. 782. We addressed thePenry case in Davis and held, "We frankly fail to see how anything inPenry affects Ohio precedents concerning inconsistent verdicts between counts or between counts and specifications." We remain unconvinced thatPenry applies here. Appellant's first and third assignments of error are not well-taken.
 {¶ 46} In her second assignment of error, appellant contends that the trial court erred in failing to instruct the jury that it may not convict her of the underlying offense merely for being an accessory after the fact. In a criminal case, a court must give requested jury instructions if they are "correct, pertinent, and timely presented." State v. Joy
(1995), 74 Ohio St.3d 178, 181. The Ohio Supreme Court has also explained that, "The court must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder." Id. However, the trial court is not required to give instructions in the precise language requested; rather, the trial court may employ its own language to convey to the jury the applicable law.State v. Miniard, 2004-Ohio-5352, 4th Dist. No. 04CA1, at ¶ 33, citingState v. Nelson (1973), 36 Ohio St.2d 79, paragraph one of the syllabus, overruled on other grounds, State v. Fanning (1982), 1 Ohio St.3d 19, paragraph one of the syllabus.
 {¶ 47} In this case, appellant's trial counsel requested an instruction that being an accessory after-the-fact was not sufficient to convict the appellant on the underlying offense. The prosecutor indicated that it had no intention of arguing that the jury should convict appellant merely because she cleaned up afterwards. The trial court indicated to defense counsel that it could argue in closing argument that being an accessory after-thefact was not sufficient to convict on the underlying charge, and the trial court did not add the requested language to its instruction on aiding and abetting.
 {¶ 48} The Ohio Supreme Court has held that, if the trial court properly instructs the jury on Ohio law pertaining to aiding and abetting, it is under no obligation to also give an instruction on accessories after-the-fact. State v. Carver (1972), 30 Ohio St.2d 280, 290. The Ohio Third Appellate District recently considered this issue as well. See State v. Boddie (Sept. 6, 2001), 3d Dist. No. 1-2000-72, appeal denied (2002), 94 Ohio St.3d 1430. In Boddie, the trial court instructed the jury on aiding and abetting as follows:
 {¶ 49} "Aiding and Abetting contains two basic elements: An act on the part of the defendant, which contributes to the execution of a crime and the intent to aid in its commission.
 {¶ 50} "Before you find the defendant guilty of complicity in the commission of an offense, you must find beyond a reasonable doubt that the defendant must have taken a role in causing the commission of an offense. That he helped, assisted, strengthened, advised, hired, incited, commanded, encouraged, or counseled the principal to do the act. In the absence of a conspiracy or some other preceding connection with the transaction, one does not aid or abet if he merely sees a crime being committed. Mere association with the principal is not enough.
 {¶ 51} "To prove aiding and abetting, however, direct and circumstantial evidence may be introduced. Therefore, participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed. In other words, there must be proof that Defendant, Martice L. Boddie, had in some way participated in, or been a part of the act committed."
 {¶ 52} The defendant in Boddie requested additional language on presumptions and accessories after-the-fact. The Third District held that the trial court properly refused to give the additional language because the instruction given "clearly requires more than mere after-the-fact presence or approval." Id.
 {¶ 53} The aiding and abetting instruction given in Boddie was similar to the one given in this case. Here, the court instructed that mere presence at a crime scene or merely seeing a crime being committed, without aiding or assisting in the commission of the crime, is not enough to establish aiding and abetting. Therefore, we find that the instruction given properly informed the jury that mere after-the-fact acts are not enough to establish aiding and abetting. Appellant's second assignment of error is found not well-taken.
 {¶ 54} In her fourth assignment of error, appellant challenges her eight-year sentence for aggravated robbery, which is to run consecutive to her sentence for murder. According to appellant, the trial court's findings under R.C. 2929.12 are not supported in the record. Specifically, appellant contends that the record does not support the trial court's finding that the victim suffered serious physical harm as a result of the robbery, that she (appellant) has a history of criminal convictions, and that she lacks remorse for the crime. We understand this assignment of error to challenge both the length of the aggravated robbery sentence and the concurrent nature of the aggravated robbery and murder sentences.
 {¶ 55} An appellate court's choices upon review of a sentence are set out in R.C. 2953.08(G)(2). That section provides:
 {¶ 56} "The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
 {¶ 57} "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard of review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
 {¶ 58} "(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (E)(4) of section 2929.14, or division (H) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
 {¶ 59} "(b) That the sentence is otherwise contrary to law."
 {¶ 60} Former R.C. 2929.14(E)(4), which governed consecutive sentencing, provided:
 {¶ 61} "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 62} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 63} "(b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 64} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 65} In addition, R.C. 2929.19(B)(2), which governs sentencing hearings, provided:
 {¶ 66} "The court shall impose a sentence and shall make a finding that gives its reasons for selecting the sentence imposed in any of the following circumstances:
 {¶ 67} "* * *.
 {¶ 68} "(c) If it imposes consecutive sentences under section 2929.14
of the Revised Code, its reasons for imposing the consecutive sentences."
 {¶ 69} The Ohio Supreme Court has interpreted these sections to mean that a court ordering consecutive sentences must, at the sentencing hearing, make the findings required by R.C. 2929.14 and give its reasons for the findings. State v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, at ¶ 20. The court in Comer explained.
 {¶ 70} "While consecutive sentences are permissible under the law, a trial court must clearly align each rationale with the specific finding to support its decision to impose consecutive sentences. These findings and reasons must be articulated by the trial court so an appellate court can conduct a meaningful review of the sentencing decision." Id. at ¶ 21.
 {¶ 71} In this case, the trial court at the sentencing hearing considered the factors enumerated in R.C. 2929.12 and found that the victim suffered serious physical harm, that appellant had an unacknowledged drug or alcohol problem, and that appellant lacked remorse. The court then stated,
 {¶ 72} "As to the first degree felony, aggravated robbery, the Court has considered the minimum sentence and finds that that would demean the seriousness of the offense and not adequately protect the community. The Court has further considered whether to impose consecutive or concurrent sentences, and the Court finds that consecutive sentences are necessary to protect the public and adequately punish the defendant, and that a single term for both offenses would not adequately reflect the seriousness of the conduct involved here. Therefore, consecutive sentences are warranted to fulfill the purposes of the Ohio Revised Code 2929.11 and is not disproportionate to the offenses before the Court."
 {¶ 73} It is apparent from the transcript of the sentencing hearing that the trial court made the findings necessary to impose consecutive sentences but did not give its reasons for the findings. Even if we were to deem the trial court's consideration of the R.C. 2929.12 sentencing factors as its reasons for imposing consecutive sentences, the trial court did not "clearly align each rationale with the specific finding to support its decision to impose consecutive sentences." Comer,2003-Ohio-4165, at ¶ 21. See, also, State v. Rothgeb, 2d Dist. No. 02CA07, 2003-Ohio-465, at ¶ 25.[1] Therefore, we must remand this case to the trial court to determine whether consecutive sentences are appropriate and, if so, to state on the record at the sentencing hearing what its findings and reasons are.
 {¶ 74} Appellant also challenges the length of her sentence. Former R.C. 2929.14(A)(1) provided:
 {¶ 75} "Except as provided in division (C), (D)(1), (D)(2), (D)(3), (D)(4), or (G) of this section and except in relation to an offense for which a sentence of death or life imprisonment is to be imposed, if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender pursuant to this chapter and is not prohibited by division (G)(1) of section 2929.13 of the Revised Code from imposing a prison term on the offender, the court shall impose a definite prison term that shall be one of the following:
 {¶ 76} "(1) For a felony of the first degree, the prison term shall be two, three, four, five, six, seven, eight, nine, or ten years."
 {¶ 77} Appellant received a ten-year sentence, which is more than the minimum sentence but less than the maximum. The parties apparently agree that appellant has never served a prison term. Therefore, former R.C. 2929.14(B) also applies. That section provided:
 {¶ 78} "Except as provided in division (C), (D)(1), (D)(2), (D)(3), or (G) of this section, in section 2907.02 of the Revised Code, or in Chapter 2925. of the Revised Code, if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender, the court shall impose the shortest prison term authorized for the offense pursuant to division (A) of this section unless one or more of the following applies:
 {¶ 79} "(1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term.
 {¶ 80} "(2) The court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others."
 {¶ 81} While the court must make these findings on the record at the sentencing hearing, it is not required to give reasons for its findings under this section. Comer, 2003-Ohio-4165, at ¶ 26, fn. 2.
 {¶ 82} In this case, the trial court stated at the sentencing hearing that it considered imposing the minimum sentence but determined that doing so would "demean the seriousness of the offense and not adequately protect the community." The trial court needed to make only one of these findings to justify more than the minimum prison term. We conclude that, at the very least, the finding that the minimum sentence would not adequately protect the public is supported by the record. The record shows a history of unacknowledged and untreated substance abuse, and this substance abuse played a part in the instant offense. The trial court was warranted in finding that the substance abuse makes recidivism more likely. See R.C. 2929.12(D)(4). Since the trial court made appropriate findings before ordering more than the minimum sentence, and since at least one of those findings is clearly supported in the record, the trial court did not err in sentencing appellant to eight years in prison for the aggravated robbery. Appellant's fourth assignment of error is found not well-taken.
 {¶ 83} In her reply brief, appellant, for the first time, raises a challenge to the aggravated robbery sentence based on Blakely v.Washington (2004), 124 S.Ct. 2531. Blakely addressed whether a criminal defendant's Sixth Amendment right to trial by jury was violated when a court used a fact not found by the jury to enhance the defendant's sentence beyond the presumptive statutory maximum. However, this issue was not presented in appellant's fourth assignment of error, which dealt with whether the record supported an eight-year consecutive sentence. No constitutional issue was raised in this assignment of error. Pursuant to App. R. 12(A), we are to decide the appeal based on the assignments of error presented. Since appellant never raised the Blakely issue in her assignment of error, and since she never moved to amend her assignments of error to include this issue, we need not consider it. See State v.Warden, 6th Dist. No. WD-03-065, 2004-Ohio-6306, at ¶¶ 53-54.
 {¶ 84} Upon due consideration, we conclude that appellant was not prejudiced or prevented from having a fair trial, and the decision of the trial court finding appellant guilty of murder and aggravated robbery is affirmed. The trial court's judgment sentencing appellant to eight years in prison for the aggravated robbery is also affirmed. The portion of the trial court's judgment ordering the aggravated robbery sentence served consecutively to the murder sentence is vacated. This case is remanded to the trial court to consider whether consecutive sentences are appropriate and, if so, to enter the proper findings and reasons on the record. Pursuant to App. R. 24, each party is ordered to pay one-half of the court costs of this appeal.
Judgment affirmed, in part and reversed, in part.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4, amended 1/1/98.
Handwork, J., Knepper, J., Pietrykowski, J., concur.
[1] The court in Rothgeb noted:
"The court is permitted by R.C. 2929.14(E)(4) to order consecutive sentences only after certain findings are made. By requiring the court to then state the reasons for those findings, R.C. 2929.19(B)(2)(c) obliges the court to not only have reasons but also to state what those reasons are. Further, in stating its reasons the court must connect those reasons to the finding which the reason supports. The court cannot merely pronounce causes that objectively may be reasons. The court must also identify which of those causes are the particular reasons for each of the statutory findings the court made." Id.