OPINION
{¶ 1} Bryan M. Ortega appeals from his conviction and sentence in the Montgomery County Court of Common Pleas for aggravated burglary. *Page 2 
 {¶ 2} The record in this matter reveals that on July 3, 2006, Brian Mayo, 16; Tommy Zula, 14; and Matthew Donathan, 17, were spending the night at Mayo's home at 104 Calmont Farm Circle in Union, Ohio. At approximately 12:20 a.m., Zula answered a knock on the door. Appellant, Bryan Ortega, was there, asking to speak to Mayo's older brother, Tony. According to Ortega, co-defendant, Marc Ross, had asked Ortega to accompany him to Tony Mayo's residence while Ross confronted Mayo about selling Xanax to Ross's girlfriend, Janelle Lopez.
 {¶ 3} When he was told that Tony was not at home, Ortega returned to the vehicle where Ross was waiting. Thirty minutes later, the three teens heard a second knock on the door. As Zula was answering the door, Ross and Ortega forced their way into the home, demanding to know where "the money" was and where Tony was. (Tr. at 312.) Ortega pulled out a gun and ordered that the three boys get onto the floor. Thereafter, Ross searched the bedrooms upstairs, allegedly taking $13.00 from Brian Mayo's dresser, while Ortega remained behind to watch the teens. When finished with the search, Ross and Ortega asked for the boys' cell phones. Brian Mayo gave his phone to the men, but Zula and Donathan replied that they did not have their phones with them. Ross and Ortega then turned to leave. As they were doing so, Ortega yelled, "Tell Tony, Fire was here. I want my money." (Tr. at 175.) Furthermore, the two men exclaimed that they would kill each of the boys if they called the police.
 {¶ 4} Minutes after Ross and Ortega had gone, the three boys called Mayo's friend, Travis Weller, and his mother. They asked if Ms. Weller would drive down the street outside the Mayo residence and see whether the two men were still in the area. Upon doing so and determining that Ross and Ortega were no longer in the vicinity, *Page 3 
Travis and his mother went to Mayo's home. The three teens exited the house. Mayo and Zula got into the car with Travis and his mother, while Donathan left in his own vehicle. Subsequently, at Weller's home, Mayo called his mother, who then called the police.
 {¶ 5} Meanwhile, at approximately 12:37 a.m., Janelle Lopez was stopped on West Martindale Road by a Union police officer on a suspicion that she was driving under the influence. At that time, Lopez and her passenger, Phillip Swabb, were driving a car registered to Ortega's friend, Aaron Fields. Earlier that evening, Ortega, Ross, Lopez and Swabb had met at Meijer in Englewood; Ortega was driving Fields's car at that time. At Meijer, Ortega and Ross paired up in Ross's vehicle in order to drive together to Tony Mayo's house. Lopez and Swabb stayed behind in Ortega's vehicle.
 {¶ 6} Lopez was given a field sobriety test, which she failed. She was consequently placed under arrest. Because Swabb did not have a valid driver's license, he could not drive Ortega's car. Therefore, Lopez was permitted to call Ortega to pick up the car and Swabb.
 {¶ 7} At approximately 1:25 a.m., Lieutenant Darrin Goudy called Ortega and asked him to come to the scene and take possession of his vehicle. Ortega responded that he would be there shortly, as he was nearby at 104 Calmont Farm Circle. Soon thereafter, Ortega and Ross arrived. They picked up Swabb and the vehicle and then drove away. Ortega left Ross and Swabb at Ross's vehicle before driving to Fields's home in Vandalia.
 {¶ 8} Subsequently, Ortega was contacted by Detective Steven Watern regarding an "incident that occurred" on July 3, 2006 at 104 Calmont Farm Circle. (Tr. *Page 4 
at 899.) On that same day, Ortega spoke to Ross, who told him that Brian Mayo, Zula and Donathan had contacted the police. The two men were being accused of forcing their way into Mayo's home and holding the teens at gunpoint while they searched the house. In fact, Ross had been identified as one of the offenders by both Mayo and Zula at the scene on the morning of the incident. Later that same day, Zula and Donathan identified Ortega as the second individual in a photo spread shown to them at the Union Police Department.
 {¶ 9} Ortega was indicted on one count of aggravated burglary, in violation of R.C. 2911.11(A)(2); three counts of aggravated robbery, in violation of R.C. 2911.01(A)(1); three counts of kidnapping, in violation of R.C. 2905.01(A)(2); and three counts of abduction, in violation of R.C. 2905.02(A)(2). Each count included a three-year firearm specification, in violation of R.C. 2941.145. Furthermore, Ortega was charged with one count of tampering with evidence, in violation of R.C. 2921.12(A)(1).
 {¶ 10} Ortega pled not guilty to each charge, and the matter was tried before a jury on October 30-November 6, 2006. At trial, the State offered the testimony of the alleged victims — Brian Mayo, Tommy Zula, and Matthew Donathan — in addition to testimony from several police officers and Phillip Swabb. Appellant testified on his own behalf, and he offered further testimony from two friends and his pastor. Ortega admitted that he and Ross went to Tony Mayo's house on two separate occasions on July 3, 2006 to confront Tony about selling Xanax to Lopez. During the first occasion, Ortega simply inquired as to whether Tony was at home. When told he was not, he returned to the vehicle where Ross was waiting. A little while later, both Ortega and Ross entered the home asking about Tony. Ortega testified that Ross had a short *Page 5 
conversation with one of the boys in the house, during which Ross stated that Tony was ruining Lopez's life. In response, Brian Mayo told Ross and Ortega to leave. According to Ortega, he grabbed Ross by the arm and suggested they "just go." (Tr. at 887.) At that point, the two men left the residence.
 {¶ 11} At the conclusion of the trial, the jury returned a verdict finding Ortega guilty of aggravated burglary but not guilty of all other counts, including the firearm specification attached to the aggravated burglary charge. The charge of tampering with evidence had been dismissed pursuant to Appellant's Crim.R. 29 motion. Ortega thereafter filed a motion for judgment of acquittal, or in the alternative, a motion for a new trial. Such motion was overruled by the trial court. In March 2007, Ortega was sentenced to a five-year prison term.
 {¶ 12} Ortega has timely appealed from his conviction and sentence, and he assigns the following errors for our review:
 {¶ 13} "THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR ACQUITTAL BECAUSE THE JURY'S VERDICT WAS INCONSISTENT."
 {¶ 14} "THE INCONSISTENT VERDICTS WERE AGAINST THE SUFFICIENT AND/OR MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 15} Upon review, we find that Ortega's arguments lack merit. A finding of guilty on the principal charge of aggravated burglary, but not guilty on the attached firearm specification, does not constitute an inconsistent verdict in this matter. Furthermore, Ortega's conviction was not against the manifest weight of the evidence. Accordingly, the judgment of the trial court will be affirmed. *Page 6 
 I. {¶ 16} Under his first assignment of error, Ortega argues that the trial court erred in permitting inconsistent verdicts with respect to the jury's decision finding him guilty of aggravated burglary under R.C.2911.11(A)(2) but not guilty of the attached firearm specification, R.C. 2945.145.
 {¶ 17} It is well-established by courts in Ohio that "a finding of guilty on a principal charge but not guilty on a specification attached to the charge does not render the verdict inconsistent and thus invalidate the guilty verdict on the principal charge, at least where legally sufficient evidence supports the guilty verdict on the principal charge." State v. Gardner, Montgomery App. No. 21027, 2006-Ohio-1130, at ¶ 32. See, also, State v. Allen, Hamilton App. No. C-060239,2006-Ohio-6822, at ¶ 32; State v. Boyd (1996), 110 Ohio App.3d 13, 17,673 N.E.2d 607; State v. Woodson (1985), 24 Ohio App.3d 143, 24 OBR 231,493 N.E.2d 1018. Moreover, "[inconsistency in a verdict does not arise out of inconsistent responses to different counts, but rather inconsistent responses to the same count." Id. at ¶ 33, citing State v.Adams (1978), 53 Ohio St.2d 223, 7 O.O.3d 393, 374 N.E.2d 137; State v.Lovejoy (1997), 79 Ohio St.3d 440, 683 N.E.2d 1112.
 {¶ 18} Here, Ortega's conviction for aggravated burglary is not dependent on the attached firearm specification. "Specifications are considered after and in addition to the finding of guilt on the principal charge." Gardner, 2006-Ohio-1130, at ¶ 33. The jury in this matter was instructed on the firearm specification, in part, as follows:
 {¶ 19} "Firearm means any deadly weapon capable of expelling or propelling one *Page 7 
or more projectiles by the action of an explosive or combustible propellant. * * * When deciding whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, you may rely on circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm."
 {¶ 20} This Court can only speculate as to how the jury reached the decision on the specification, whether it simply found that the State failed to prove beyond a reasonable doubt that the gun at issue was operable. Nevertheless, that is only conjecture; it has no effect on the jury's finding Ortega guilty of the principal charge. SeeAllen, 2006-Ohio-6822, at ¶ 32. Accordingly, Appellant's first assignment of error is overruled.
 II. {¶ 21} Under the second assignment of error, Ortega contends that the evidence was insufficient to support his conviction for aggravated burglary. Alternatively, Ortega argues that the jury's verdict finding him guilty of aggravated burglary was against the manifest weight of the evidence.
 {¶ 22} When an appellate court reviews the sufficiency of the evidence, the proper inquiry is whether any rational finder of fact, when viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Adrian, 168 Ohio App.3d 300, 2006-Ohio-4143,859 N.E.2d 1007, at ¶ 5, citing State v. Dennis (1997),79 Ohio St.3d 421, 430, 683 N.E.2d 1096. "A guilty verdict will not be disturbed on appeal unless `reasonable *Page 8 
minds could not reach the conclusion reached by the trier-of-fact.'"Dennis, 79 Ohio St.3d at 430 (citations omitted).
 {¶ 23} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact `clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Adrian,2006-Ohio-4143, at ¶ 6, quoting State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541. Essentially, a reviewing court "sits as a `thirteenth juror' and makes its own independent review of the evidence and inferences derived therefrom, and assesses and weighs the credibility of each witness's testimony." Hagel, Ohio's Criminal Practice and Procedure (2006-07) 796, Section 41.207. However, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." State v.Lawson (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684, at *4. Only in exceptional circumstances should a judgment be reversed as being against the manifest *Page 9 
weight of the evidence. State v. Parker, Montgomery App. No. 18926, 2002-Ohio-3920, at f70 (citation omitted).
 {¶ 24} Here, Ortega was found guilty of violating R.C. 2911.11(A)(2), which provides:
 {¶ 25} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
 {¶ 26} "* * *
 {¶ 27} "(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."
 {¶ 28} Ortega does not argue that the State failed to prove one or more of the essential elements of aggravated robbery under R.C.2911.11(A)(2), as is required when arguing that the evidence is insufficient to support the conviction. Instead, he asserts that inconsistencies in the testimony of the State's witnesses, specifically Brian Mayo, Tommy Zula, and Matthew Donathan, demonstrate a lack of credibility of these witnesses. Credibility, however, is reserved for a weight of the evidence argument.
 {¶ 29} This Court addressed the issue of witness credibility under similar circumstances in State v. Gardner, Montgomery App. No. 21027,2006-Ohio-1130. There we provided that "[t]he credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of facts to resolve. State v. DeHass (1967), *Page 10 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. In State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684, we observed:
 {¶ 30} "`[b]ecause the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.' Id. at *4.
 {¶ 31} "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict. State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03, 1997 WL 691510." Id. at ¶ 24-26.
 {¶ 32} In arguing that his conviction is against the manifest weight of the evidence, Ortega asserts that the testimonies of the State's eyewitnesses to the crime are not worthy of belief. First, Ortega argues that these witnesses failed to prove that they could make an accurate identification of him, where Mayo testified that he observed Ortega holding a gun, but then stated that he could only see Ortega from the waist down; where Mayo was unable to identify Ortega in a photo spread while at the police department; and where Zula found the distinguishing feature of Ortega's face to be facial hair and not a black eye. Ortega further argues that there were discrepancies between Mayo's and Zula's written statements to the police and their testimonies at trial, most notably that their written statements provided that ten minutes lapsed between the first knock on the door and the second, not thirty minutes as the boys *Page 11 
stated at trial. Finally, Ortega challenges the testimony of Donathan, in which he provided that the teens had been swimming the day of the crime, and that he refused to turn over his cell phone when such was demanded of him at gunpoint.
 {¶ 33} As we stated above, the credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. DeHass, 10 Ohio St.2d at 231. The jury heard in this matter testimony that Ortega and Ross forced their way into Mayo's home and held the three teenage boys at gunpoint while they searched the house. It also heard that both Zula and Donathan had an opportunity to observe Ortega's face while the offense was in progress. They further were able to accurately identify Ortega in a police photo spread the following day. Simply because the jury chose to believe the version of the events presented by the State's witnesses rather than Ortega's does not demonstrate that the jury lost its way in reaching its verdict.
 {¶ 34} Thus, in reviewing the record as a whole, we cannot say that the evidence weighs heavily against the conviction for aggravated burglary, that the jury lost its way in choosing to believe the State's witnesses, or that a manifest miscarriage of justice occurred. Appellant's conviction is not against the manifest weight of the evidence. Likewise, viewing the evidence in a light most favorable to the State, we find that a rational trier of fact could find all essential elements of aggravated burglary proven beyond a reasonable doubt. Accordingly, Ortega's second assignment of error is overruled.
 {¶ 35} Having overruled each of Appellant's assignments of error, the judgment of the trial court is affirmed. *Page 12 
DONOVAN, J., and VALEN, J., concur.
(Hon. Anthony Valen, retired from the Twelfth Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio) *Page 1